UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

      -v-                                    :          **INFORMATION**

BDO USA, LLP,                                :          **S4 09 Cr. 581 (WHP)**

      **Defendant.**                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy)

The United States Attorney charges:

## I.    PERTINENT INDIVIDUALS AND ENTITIES

### A.    BDO and Its Co-Conspirators

1.    At all times relevant to this Information, BDO Seidman LLP, now known as BDO USA, LLP ("BDO"), was a major international accounting firm, which maintained its headquarters in Chicago, Illinois, and offices in various other United States cities, including New York, New York. BDO provided audit services to many corporate clients, and provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States, some of whom are unindicted co-conspirators not named as defendants herein. Those tax services included preparing tax returns, providing tax advice, and representing clients in audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

2.    At all times relevant to this Information, Denis Field, a co-conspirator not named as a defendant herein, was a lawyer with a Master of Laws degree in Taxation and a certified public accountant ("CPA"). Field became the head of National Tax at BDO in 1996, and the

Chairman and Chief Executive Officer of BDO in 1999, a position he held until October 2003.

3.      In or about early 1998, co-conspirator Denis Field, while BDO's National Tax leader, formed a group devoted to designing, marketing, and implementing high-fee tax strategies for individual clients, often with law firms, investment firms, and financial institutions. The group became known as the "Tax Solutions Group" or "TSG" (collectively hereinafter "TSG") in or about October 1999. The strategies marketed by the TSG included tax shelters that could be used by wealthy clients to eliminate or reduce taxes on significant income or gains. The tax shelters generally generated non-economic tax benefits — primarily losses or gain eliminations — that far outweighed the costs to enter into the tax shelters. BDO touted the tax shelters internally as "value-added products" whereby fees far in excess of the normal BDO hourly billing rates would be charged.

4.      From 1984 through in or about October 2004, Charles W. Bee, Jr., a co-conspirator not named as a defendant herein, was a CPA and a partner in BDO's international tax group in its New York office. Bee also served as BDO's National Director for International Taxation. From in or about July 1999 through October 2003, Bee was a member of BDO's Board of Directors. From in or about June 2000 through October 2003, Bee served as a Vice-Chairman of BDO.

5.      From in or about July 1995 through in or about October 2000, Adrian Dicker, a co-conspirator not named as a defendant herein, was a United Kingdom chartered accountant and a partner in BDO's international tax group in its New York office. From in or about early 1999 through October 2000, Dicker was a member of BDO's Board of Directors, and thereafter through in or about October 2003, Dicker served on the Board of Directors as a retired partner director.

From in or about June 2000 through October 2000, Dicker served as a Vice-Chairman of BDO.

6.     From in or about 1998 through October 2003, co-conspirators Denis Field, Charles Bee, and Adrian Dicker were the leaders of the TSG.  They were also members of BDO's Tax Opinion Committee, which analyzed tax shelter products for their potential use by BDO's clients, and reviewed templates of opinion letters to be utilized in connection with some of those tax shelters.

7.     At all times relevant to this Information, Robert Greisman, a co-conspirator not named as a defendant herein, was a lawyer and CPA, and a partner in BDO's Chicago office. Greisman was a member of BDO's TSG and assumed TSG leadership responsibilities upon the retirement of co-conspirator Adrian Dicker.  Greisman was also a member of BDO's Tax Opinion Committee.  Greisman was the point person within BDO for the preparation of income tax returns related to the reporting of tax results of BDO's clients' tax shelters.  Greisman also oversaw the provision of information to the IRS in connection with audits of various BDO tax shelter clients' income tax returns.

8.     At all times relevant to this Information, Michael Kerekes, a co-conspirator not named as a defendant herein, was a lawyer and a principal in BDO's Los Angeles office, where he acted as a technical tax expert and advisor to others at BDO.  Kerekes was a member of BDO's TSG and Tax Opinion Committee.

**B.     The Jenkens & Gilchrist Co-Conspirators**

9.     At all times relevant to this Information, Paul M. Daugerdas, a co-conspirator not named as a defendant herein, was a lawyer and CPA.  From in or about November 1994 until late December 1998, Daugerdas was a tax partner and head of the tax department at the Chicago law

firm of Altheimer & Gray ("A&G").  On or about December 29, 1998, Daugerdas resigned from A&G and, commencing on or about January 1, 1999, became the managing shareholder of the newly-formed Chicago office of Jenkens & Gilchrist, PC ("J&G"), a law firm then headquartered in Dallas, Texas.  Daugerdas served as the Chicago office's managing shareholder and head of the Chicago tax practice at J&G until in or about April 2004.  At both A&G and J&G, Daugerdas's tax practice centered around the design, marketing, and implementation of tax shelters.

   10. At all times relevant to this Information, Donna Guerin, a co-conspirator not named as a defendant herein, was a lawyer and CPA.  From at least 1994 through late December 1998, Guerin was a tax partner in A&G's Chicago office.  In late December 1998, Guerin moved to the Chicago office of J&G as a shareholder of J&G together with co-conspirator Daugerdas and other A&G lawyers.  From at least 1994 and thereafter, Guerin's practice included the design, marketing, and implementation of tax shelters.

### C. The Deutsche Bank Co-Conspirators

   11. Employees of Deutsche Bank, a foreign bank with United States headquarters in New York, New York,  structured and implemented many of the financial transactions used in the J&G tax shelters, including those involving BDO and others.

   12. From at least 1994 until in or about 1997, Alex Brown was an investment banking firm with offices nationwide, including Chicago, Illinois, and Dallas, Texas.  From 1997 until in or about June 1999, Alex Brown was an investment banking subsidiary of a national bank.  In or about June 1999, Alex Brown became an investment banking subsidiary of Deutsche Bank (Deutsche Bank Alex Brown and Deutsche Bank sometimes collectively hereinafter as "Deutsche Bank").

13.     Beginning in or about 1996, David Parse, a co-conspirator not named as a defendant herein, was a CPA and an Investment Representative in Deutsche Bank's Chicago office. Beginning in or about 1998 until in or about 2002, Parse participated in the design, marketing, and implementation of certain tax shelters with co-conspirators Paul Daugerdas and Donna Guerin of J&G, Denis Field and Robert Greisman of BDO, and others.  Parse earned substantial commissions from the implementation of the J&G tax shelters, among other tax shelters.

14.     From in or about 1998 through in or about 2003, co-conspirator David Parse worked with personnel of Alex Brown's Private Client Fixed Income desk in Baltimore, Maryland, and Deutsche Bank's foreign exchange trading desk ("FX desk") in New York, New York, to structure and implement the financial products used in certain J&G tax shelters.  J&G and BDO referred tax shelter clients to Parse and others at Deutsche Bank in order for them to provide additional details to the clients about the options, stock, and foreign currency to be used in the implementation of the BDO and J&G tax shelters.

### D.     **Other Pertinent Entities**

15.     At all times relevant to this Information, an outside law firm for BDO ("BDO Outside Law Firm A") was a major international law firm, with offices in New York and Washington, among other places.

## II.     INTRODUCTION

16.     In or about late 1998, through the efforts of co-conspirators Denis Field, Robert Greisman, Charles Bee, Adrian Dicker, Michael Kerekes, and others, defendant BDO entered into an alliance with the law firm of Jenkens & Gilchrist, pursuant to which BDO assisted in the design, marketing, and implementation of certain J&G tax shelters to BDO's clients and potential

clients, acted as a referral source for clients to purchase certain J&G tax shelters, and prepared certain of the income tax returns reporting the tax benefits of the tax shelters. In return, J&G paid BDO a portion of the fees J&G collected from clients as a result of the sale of the tax shelters. Beginning in or about the Fall of 1999, BDO charged its tax shelter clients its own fee, in addition to the fee it received from J&G on the BDO clients' tax shelter sales.

17.     From at least in or about 1998 through at least in or about 2003, defendant BDO and its co-conspirators participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the tax shelters were marketed and implemented.

18.     Defendant BDO and its co-conspirators designed, marketed, and implemented fraudulent tax shelters with J&G known as the Short Sale and Short Options Strategy ("SOS") tax shelters (collectively hereinafter "the BDO tax shelters") for clients through false and fraudulent means; prepared and caused to be prepared, and filed and caused to be filed by the clients with the IRS, false and fraudulent U.S. individual income tax returns reporting the fraudulent tax shelter losses, resulting in the payment of far lower taxes by the clients; and fraudulently concealed from and misrepresented the true nature of the tax shelters to the IRS, in order to enrich themselves personally through the generation of extraordinary fee income. Certain co-conspirators also utilized tax shelters to evade their own taxes on income received largely through the sale of the fraudulent tax shelters.

19.     Defendant BDO and its co-conspirators designed, marketed, and implemented the BDO tax shelters — portrayed to clients as turnkey tax elimination products (i.e., pre-packaged

and all-inclusive products) — as a means for wealthy individuals generally with multi-million dollar taxable income or gains to fraudulently eliminate or reduce the tax paid to the IRS on that income or gains. Thus, instead of the wealthy clients paying U.S. individual income taxes generally between 20% and 40% of their taxable income, the clients could choose the amount of tax loss or benefits, and pay BDO, co-conspirators, and others a fee generally equal to 5 to 10% of the desired tax loss or benefit. This all-inclusive cost included the fees of BDO, J&G, third-party referral sources, and/or others, as well as the net premium to Deutsche Bank used to execute the purported "investments" that were designed to make it appear that the shelters were legitimate investments rather than tax shelters. The size of the purported investments and the amount of the fees paid to BDO and its co-conspirators and others were determined based on the tax loss to be generated.

20. Defendant BDO and its co-conspirators understood that if the IRS were to detect the clients' use of the respective tax shelters and learn the true facts and circumstances surrounding their design, marketing, and implementation, including their lack of both economic substance and genuine business purpose, the IRS would disallow the claimed tax benefits, and seek to impose substantial penalties, in addition to the tax and interest owed. Accordingly, BDO and its co-conspirators undertook to prevent the IRS from: (i) detecting their clients' use of these tax shelters; (ii) understanding how the steps of the tax shelters operated to produce the purported tax benefits claimed by the clients; (iii) learning that these tax shelters were marketed as cookie-cutter products that were designed to and did significantly reduce or eliminate the clients' tax obligations; (iv) learning that any potential payout from the financial product used in the tax shelter could never overcome the total fees required to engage in the tax shelter; (v) learning that the clients were not genuinely seeking profit-making investment opportunities, but were, instead, seeking huge tax

benefits; and (vi) learning that from the outset the clients intended to complete a preplanned series of steps that had been designed by BDO and its co-conspirators to lead to the specific tax losses sought by the clients.

## III.    THE BDO TAX SHELTERS

### A.    The Fraudulent Short Sale and SOS Shelters

21.    While at A&G, co-conspirators Paul Daugerdas and Donna Guerin designed, marketed, and implemented a tax shelter known as the Short Sale tax shelter. Daugerdas, Guerin, and another J&G attorney brought the Short Sale tax shelter with them to J&G, and marketed and implemented it with defendant BDO and its co-conspirators, among others.

22.    The Short Sale tax shelter was typically implemented through three entities set up by J&G — a single-member limited liability company ("LLC"), a partnership, and an S corporation — and typically involved the following preplanned steps. Through the LLC, the client borrowed U.S. Treasury securities ("Treasuries") from Deutsche Bank and then sold them, thereby generating cash proceeds for the client (the so-called "short sale" of Treasuries). Subsequently, the client contributed the proceeds to a partnership, together with the obligation to close, or "cover," the short position through the purchase of replacement Treasuries. Although the contribution of the short sale cash proceeds — in an amount that correlated to the tax loss sought by the client — was treated as a partnership asset (thereby increasing the client's tax basis in the partnership), BDO and J&G took the position that the obligation to cover the short sale was not a liability for tax purposes because, notwithstanding the obligation to replace the Treasuries, the precise amount required to do so was not yet fixed or determined. Using additional client funds, the client through his or her partnership purchased a small amount of either shares of stock or foreign currency, or the client

contributed such assets to the partnership. The short sale would then be closed, usually after just a few days' duration and always before year's end. Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. BDO and J&G took the position that the subsequent sale of that stock or foreign currency, executed through Deutsche Bank, produced reportable tax losses for the clients. Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter. Those tax losses vastly exceeded any actual economic loss suffered by the client. The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

23.    A second and similar tax shelter, known as the "short options strategy" or "SOS" tax shelter, was designed, marketed, and implemented by BDO and its co-conspirators. It typically involved the following preplanned steps. Through an LLC, the client purchased from Deutsche Bank a long foreign currency digital option with a stated premium, or cost, equaling the amount of the tax loss the client sought to generate. Simultaneously, the client sold to Deutsche Bank a short foreign currency digital option with a virtually offsetting premium. The only money that the client was required to pay to Deutsche Bank — which was the only amount that the client was at risk of loss — was the difference between the premiums paid for the long and received for the sale of the short ("the net premium"), which typically was one percent (1%) of the tax loss sought by the client. Virtually all of the BDO/J&G SOS options had an approximate one-third chance of doubling the net premium, two-third chance of losing the net premium and a purported

remote possibility of making a much larger multiple of the net premium (the so-called "lottery" or "sweet spot").

24.     The client then contributed the long and short options to a partnership, which resulted in an increase in the client's tax basis in the partnership equal to the long option. BDO and J&G took the position that the short option would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur. As in the Short Sale tax shelter, using funds supplied by the client, the partnership then purchased a small amount of foreign currency or shares of stock, or the client contributed such assets to the partnership. Thereafter, often after a short duration and always before year's end, the partnership would close the options positions. Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. BDO and J&G took the position that the subsequent sale of that stock or foreign currency, executed through Deutsche Bank, produced reportable tax losses for the clients. Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter. Those tax losses vastly exceeded any actual economic loss suffered by the client. The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

## IV.     THE TAX SHELTER FRAUD

### A.     Fraud in the Design of the BDO Tax Shelters

25.     The Short Sale and SOS tax shelters were designed to produce tax losses for

the clients through a contrived and preplanned series of steps that lacked both economic substance and business purpose, and resulted in non-economic losses from the shelter flowing to the clients in order to offset their taxable income and reduce their income tax liabilities. There was no reasonable possibility for the clients to make a profit, given the duration and structure of the tax shelters and the fees required to be paid to obtain the losses. BDO and its co-conspirators marketed the Short Sale and SOS tax shelters as a way to eliminate clients' taxes. The use of the entities in the Short Sale and SOS tax shelters — the LLC, partnership, and S corporation — was designed to achieve the desired tax loss in a manner that concealed the true nature of the tax shelters from the IRS.

26.   Personnel of Deutsche Bank's FX desk constructed the SOS options as a pair of a long and short options with the so-called "sweet spot" or lottery feature, whereby the tax shelter client's out-of-pocket cost would be one per cent (1%) of the net of the long and short options premiums. As defendant BDO and its co-conspirators well knew, there was in fact no reasonable possibility that the sweet spot would ever be hit by a tax shelter client. Indeed, because the risk of having to make a payout on the sweet spot was so small — essentially nil — personnel of Deutsche Bank's FX desk made a decision not to hedge the sweet spot. Despite the lack of any possibility of a sweet spot payout, BDO and its co-conspirators continued to portray the sweet spot as a remote but real possibility to potential tax shelter clients. They did so in order to enable the tax shelter clients to argue to the IRS that the sweet spot provided profit potential, when BDO and its co-conspirators knew there was none because the sweet spot could not be hit and Deutsche Bank personnel would not permit it to be hit.

27.   The fees charged to the tax shelter clients were based on the amount and

character of the tax losses sought by the clients. For the Short Sale and SOS shelters, J&G generally charged the clients a fee of three per cent (3%) of the desired tax loss for capital losses, and a fee of four per cent (4%) of the desired tax loss for ordinary losses. For BDO clients, J&G further agreed to pay BDO 20% of the fee J&G received. BDO, which marketed the tax shelters to existing and potential clients, also typically charged the client an additional fee of three to five per cent (3%-5%) of the desired tax loss. Deutsche Bank generally received commissions for the Short Sale tax shelters and a 1% net premium on the SOS tax shelters. The net premium included Deutsche Bank's profit and the costs of implementing the options. BDO and J&G paid other referral sources a portion of its fees in payment for the referral of clients.

**B.**      **Fraud in the Marketing of the J&G Tax Shelters**

28.      To obtain tax shelter clients, the J&G co-conspirators created a large referral network, soliciting clients from numerous sources including other law firms and accounting firms. J&G paid the referral sources millions of dollars in fees in exchange for the client referrals. One of the most significant referral sources for the J&G co-conspirators was BDO, with whom J&G did approximately 196 Short Sale and SOS tax shelter transactions. BDO surveyed its base of tax and audit clients for tax shelter prospects, and developed alliances with other financial firms to provide referrals to J&G for additional tax shelter clients.

**C.**      **Fraud in the Implementation of the BDO Tax Shelters**

**(1)**      **The false and fraudulent J&G opinion letters**

29.      The law in effect at all times relevant to this Information provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer — ranging from 20% to 40% of the

underpayment attributable to the shelter — unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the client would "more likely than not" prevail in claiming the tax benefits from the tax shelter if challenged by the IRS. Thus, in order to encourage clients to participate in the tax shelters, J&G provided a cookie-cutter "more likely than not" opinion letter ("the opinion letter") to the tax shelter clients. However, defendant BDO and its co-conspirators knew the tax shelter opinion letters were based on false and fraudulent statements and omitted material facts. By helping clients obtain the false and fraudulent opinion letters, with the understanding and intent that they would be presented to the IRS in defense of the transaction, if and when the clients were audited, BDO and its co-conspirators sought not only to undermine the ability of the IRS to ascertain the clients' true tax liabilities, but also to undermine the IRS's ability to determine whether penalties should be imposed.

        30.    The J&G SOS opinion letter contained the following false and fraudulent representations, among others:

        a.    The opinion stated:

> You entered into the purchase and sale of the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the [foreign currency]/U.S. Dollar exchange rate and the [second foreign currency]/U.S. Dollar exchange rate relationships would change; and (ii) your belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the Options.

In truth and fact, the clients entered into the purchase and sale of the options in order to obtain the desired tax benefits, and had no substantial nontax business reasons for entering into them.

        b.    The opinion stated, "You contributed the Options to the Partnership for substantial nontax business reasons, including, but not limited to, potential diversification of the

risks of certain investments, the desire to co-invest as partners with the other co-partners and for

your convenience." In truth and fact, the clients had no substantial nontax business reasons for that

step, and the clients took that step because the conspirators directed them to do so in order to achieve

the tax losses or benefits they purchased.

        c.      The opinion stated, "Your contribution of your interest in the

Partnership to [the S corporation] was made for substantial nontax business reasons including, but

not limited to, consolidation of investment activities, bookkeeping, accounting and tax functions and

elimination of duplicate work and expenses in administration." In truth and fact, the clients made

the contribution in order to achieve the tax benefits and for no nontax business reason whatsoever.

        d.      The opinion stated, "Neither you, [the] LLC, the Partnership, nor [the

S corporation] were obligated to engage in any transaction to which our opinions herein relate upon

the completion of any other of such Transactions." In truth and fact, defendant BDO and its co-

conspirators marketed to their clients, and the clients had paid fees to obtain, a tax shelter that, while

not legally compelling a participant to complete any particular part of the transaction, consisted of

a contrived, preplanned, and preordained series of steps designed to result in the predetermined tax

benefits, for which the client was paying large fees to BDO and others.

        e.      The opinion stated, "To the best of your knowledge, you have

provided to us all the facts and circumstances necessary for us to form our opinion, and the facts

stated herein are accurate." In truth and fact, BDO and its co-conspirators virtually never spoke with

the clients about the facts and circumstances, or any of the representations, contained in the opinion

letters, did not receive affirmation about the veracity of the facts and circumstances or the

representations from any representative of the clients, and in some instances had no client contact

-14-

at all.

31.     The J&G Short Sale opinion letters contained false and fraudulent representations virtually identical to those in the SOS opinion letters, all intended to convey to the IRS and federal courts that the clients had substantial nontax business reasons for entering into the various steps of the tax shelters, when in truth and fact the clients had no nontax business purpose — their purpose was to obtain the tax losses.

32.     The J&G tax shelter opinions purported to be based upon "all the facts and circumstances necessary" for J&G to form its opinion.  However, the J&G opinions failed to disclose that defendant BDO and J&G had designed and marketed the tax shelters, and implemented them on behalf of the clients, and that BDO and J&G had collected as its fee a percentage of the loss amount generated.  In addition, the J&G opinions failed to disclose the following material facts, among others: (i) that the tax shelter clients responded to a promotional pitch that emphasized the respective shelter's tax benefits, and they entered into the transaction primarily or exclusively to obtain those tax benefits; (ii) that the clients knew from the outset that a particular series of steps would be undertaken, for a given fee, leading ultimately to a specific tax result; (iii) that the tax shelters were structured so that each client would probably lose his or her entire cash contribution plus fees, and had no reasonable possibility of making a profit; and (iv) that the "more likely than not" opinion letters had been offered to the clients as part of BDO and J&G's co-promotion of the tax shelter.

### (2)     The creation and use of false and fraudulent transactional documents in the BDO tax shelters

33.     In order to maximize the appearance that each tax shelter was an investment undertaken to generate profits, and to minimize the likelihood that the IRS would learn that the tax

shelters were actually designed to create tax losses, defendant BDO and its co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent information, including false and fraudulent descriptions of the clients' motivations for entering into the tax shelters' financial transactions and for taking the various steps that would yield the tax benefits.  BDO and its co-conspirators intended that the false and fraudulent information ultimately be provided to the IRS to support the shelter losses or benefits claimed on the tax returns and defend against the imposition of penalties.  Examples of such documents include letters purporting to document the client's business purpose for the use of the partnership in the transaction and the client's investment purpose in entering into the options transaction.  The J&G co-conspirators also frequently drafted and sent to the clients the letters of authorization and other documents utilized to execute the preplanned steps of the J&G tax shelters, with instructions to the clients to sign but not date the documents, but later inserted many of the dates on the documents after the various steps had occurred.

34.    As a result of their awareness that the BDO tax shelters lacked both reasonable profit potential and business purpose, and therefore were likely to be  successfully challenged by the IRS, defendant BDO and co-conspirators Denis Field, Robert Greisman, Charlie Bee, Adrian Dicker, and Michael Kerekes, as well as other BDO TSG members, developed and used a template consulting agreement to disguise the fact that the fees clients would be charged by BDO were solely for the tax shelters.  The consulting agreement contained a false and fraudulent description of the nature and scope of the services to be rendered under the agreement, and deliberately omitted any mention of the tax shelter.  In truth and fact, as BDO and its co-conspirators knew, the services to be rendered by BDO under the consulting agreement and the fees referenced

therein were solely for the sale and implementation of the tax shelter. This was done so that BDO and its clients could falsely tell the IRS that the fees were for services in addition to the tax shelter, and therefore only a portion of BDO's fees should be counted when conducting a profitability analysis of the tax shelter.

(3)     **Preparation of the false and fraudulent income tax returns reporting the tax shelter benefits**

35.     Defendant BDO, under the supervision of co-conspirator Robert Greisman, prepared many false and fraudulent partnership and S corporation returns, and, for some clients, individual income tax returns, that reflected the tax benefits of the BDO tax shelter transactions for its clients. BDO and many of the clients' own accountants refused to sign income tax returns reporting the tax shelter benefits unless and until J&G issued its opinion letter.

**D.     Fraud During IRS Audits and Litigation Related to the BDO Tax Shelters**

36.     Beginning in or about 2002, the IRS began examinations, or audits, of BDO and certain individuals and entities that had participated in BDO tax shelters. In connection with those examinations, the IRS sought documents and sworn testimony from individuals knowledgeable about various aspects of the tax shelters. In order to mislead the IRS about the true nature of the tax shelters, BDO and its co-conspirators provided and caused to be provided false information to the IRS during the promoter penalty examination and audits of tax shelter clients' tax returns, including false responses to IRS Information Document Requests, false sworn testimony to the IRS, and false sworn testimony in federal courts in tax shelter-related litigation. This included false testimony by co-conspirator Michael Kerekes and various tax shelter clients. This also included co-conspirator Robert Greisman's coaching of clients to provide false information and statements to the IRS in connection with IRS audits, and his subornation of perjury in sworn IRS testimony.

### E.   Tax Harm Caused by the Fraudulent Tax Shelters

37.   Because the tax shelters were executed simply to generate huge tax losses (and lacked economic substance and business purpose), the tax shelters resulted in massive tax evasion caused by the defendant on behalf of its clients.

38.   From in or about 1998 through at least in or about 2003, defendant BDO sold and implemented the Short Sale and SOS tax shelters to at least 196 wealthy BDO clients, and generated at least $1.3 billion in false and fraudulent tax losses.  Among the individuals who used SOS-type shelters to evade their own taxes, largely on income earned from the sale of tax shelters, were co-conspirators Denis Field, Robert Greisman, Charles Bee, Adrian Dicker, Paul Daugerdas, and other co-conspirators not named as defendants herein.

### F.   The Income Received by BDO from the Tax Shelters

39.   As a result of the involvement of defendant BDO in the fraudulent Short Sale and SOS tax shelters with J&G, BDO was paid approximate gross fees during the tax years 1998 through 2003 of at least $54,000,000.

### Statutory Allegations

40.   From at least in or about 1997 through in or about 2003, in the Southern District of New York and elsewhere, BDO, the defendant, and its co-conspirators willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7206.

**Objects of the Conspiracy**

41.     It was a part and object of the conspiracy that, from in or about 1997 through in or about 2003, BDO, the defendant, and its co-conspirators willfully and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

42.     It was a further part and object of the conspiracy that, from in or about 1997 through in or about 2003, BDO, the defendant, and its co-conspirators willfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing by the tax shelter clients, in violation of Title 26, United States Code, Section 7201.

43.     It was a further part and object of the conspiracy that, from in or about 1997 through in or about 2003, BDO, the defendant, and its co-conspirators willfully and knowingly would and did make and subscribe false and fraudulent tax returns, and aid and assist in the preparation and filing of said tax returns for its tax shelter clients, in violation of Title 26, Sections 7206(1) and (2).

**Means and Methods of the Conspiracy**

44.     Among the means and methods by which BDO and its co-conspirators, and others known and unknown to the grand jury would and did carry out the objectives of the conspiracy were the following:

a.     They would and did design, market, and implement the tax shelters, and create false and fraudulent factual scenarios to support those transactions, so that wealthy

individuals could pay a percentage of their income or gain in fees to BDO, J&G, Deutsche Bank, and the other participants in the transactions, rather than paying a substantially greater amount in taxes to the IRS;

        b.     They would and did design, market, and implement the tax shelter transactions in ways that made it difficult for the IRS to detect it and determine the true nature of the transaction;

        c.     They would and did design, market and implement the tax shelter transactions in ways that disguised the fact that the tax shelters were tax-motivated, and lacked virtually any nontax business purpose;

        d.     They would and did seek to prevent the IRS from learning that they had marketed tax shelters consisting of preplanned steps leading to predetermined tax benefits;

        e.     They would and did prepare and assist in preparing, and cause to be prepared, false and fraudulent documents in order to deceive the IRS, including but not limited to, transactional documents and correspondence;

        f.     They would and did craft and assist in crafting legal opinions for use by the tax shelter clients in defending the transactions and shielding the clients from penalties, knowing that these opinions contained false, fraudulent, and misleading information and omitted other information, all of which was material to a determination of whether the claimed tax results were allowable;

        g.     They would and did prepare and cause to be prepared tax returns for the tax shelter clients that were false and fraudulent because, among other things, they claimed

fraudulent tax losses and thereby substantially understated the tax due and owing by the tax shelter clients;

       h.    They would and did provide and cause to be provided false information to the IRS during the course of audits of clients' tax shelter returns and make and cause to be made false statements to the IRS and sworn false testimony in tax shelter-related litigation; and

       i.    They would and did pay and cause to be paid bonuses to employees and referral fees to third-party referral sources, which frequently were not disclosed to the client, as a means of rewarding those who successfully marketed the tax shelter transactions and to provide incentives to others to do so.

### Overt Acts

       45.    In furtherance of the conspiracy and to effect the illegal objects thereof, defendant BDO and its co-conspirators committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

       a.    On or about January 12, 1999, co-conspirator Robert Greisman sent a letter and attached spreadsheet to co-conspirator Paul Daugerdas, and copied co-conspirator Denis Field, which confirmed the tax shelter transactions for Short Sale clients whom BDO referred to J&G and the estimated fees that J&G owed BDO relating to those clients.

       b.    On or about March 15, 1999, co-conspirator Robert Greisman sent to the BDO Tax Opinion Committee members, including co-conspirator Denis Field, a memorandum that discussed the issues surrounding the inclusion of fees as transactions costs in the Short Sale tax shelter.  Greisman noted, "As such, it is understood that transaction costs, when set against the

expected profit on the short sale trade, would render it impossible to earn a profit on the trade. If it's impossible to earn a profit, presumably a taxpayer's reliance on a tax opinion would be unreasonable for purposes of avoiding penalties." Greisman further discussed as a possible solution the "re-engineering" of the fee of co-conspirator Paul Daugerdas "so as to separate out the fees for the tax opinion from other tax and legal consulting they provide in connection with a transaction that gives rise to capital gain, such as the sale of the business." Greisman further noted Daugerdas's willingness to consider such a proposal provided that his overall fee not be reduced.

        c.     In or about September 1999, co-conspirator Adrian Dicker, after speaking to another accountant involved in the design, marketing, and implementation of tax shelters, introduced to and discussed with co-conspirators Denis Field and Robert Greisman, and other TSG members a way to attempt to conceal the reporting of the losses generated by the tax shelters through the netting of gains and losses on a grantor trust tax return, instead of reporting the gains and the losses separately on the clients' individual income tax return.

        d.     In or about Fall 1999, co-conspirator Michael Kerekes met with Client N.D. to pitch him on an SOS tax shelter that could eliminate taxes the Client expected to pay on his 1999 income.

        e.     On or about October 1, 1999, co-conspirator Denis Field presented a Power Point slide show at a BDO partnership meeting, emphasizing the profits already generated by and to be generated by the sale of BDO's tax shelter products.

        f.     On or about November 8, 1999, Michael Kerekes, a co-conspirator not named as a defendant herein, signed and sent a consulting agreement to Client N.D. that falsely

and fraudulently described the services to be rendered under the agreement as comprising:

> consulting services in conjunction with ongoing planning for [Client
> N.D.'s] business interests, including planning for future operations
> and/or orderly termination and liquidation thereof, assisting [Client
> N.D.] and entities [he] control[s] in evaluating the various options
> and their consequences, providing numerical computations . . . to
> illustrate those consequences, coordinating with [Client N.D.'s] legal
> counsel, estate planners and financial advisors to coordinate the
> resolution of matters relating to [Client N.D.'s] other business, legal
> and financial matters, and such other services as [Client N.D.] may
> request that relate to the above-listed services.

The consulting agreement, which did not mention the tax shelter, provided that Client N.D. would

be required to pay BDO $650,000 — approximately 3% of the $22.7 million tax loss sought by

Client N.D.

        g.      On or about November 4, 1999, co-conspirator Robert Greisman sent

an e-mail to co-conspirators Donna Guerin and Denis Field, among others, containing the comments

of BDO's TSG members with respect to the J&G tax opinion letter for the SOS tax shelter.

        h.      On or about November 15, 1999, co-conspirator Robert Greisman

drafted a template letter to be sent to clients and placed in client files in order to provide false and

fraudulent business purpose for BDO's tax shelters. The letter provided: "Dear [blank,] Just a short

note to confirm that I've thought about the business and tax issues we've been discussing and

concluded that you should contribute the investments to the partnership. Best regards, Robert

Greisman."

        i.      On or about December 8, 1999, co-conspirator Robert Greisman sent

via e-mail to co-conspirator Donna Guerin a memorandum that detailed each step that still needed

to occur in the ongoing SOS transactions and who — as between BDO, J&G, and Deutsche Bank

— would be responsible for the completion of each particular step.

        j.      In or about late 1999 or early 2000, during a discussion about profit potential in the tax shelter transactions in light of the fees charged by J&G and BDO, co-conspirator Charles Bee discussed with co-conspirator Paul Daugerdas the disguising of BDO's tax shelter fees through the use of a consulting agreement or engagement letter that falsely portrayed the nature and scope of the services to be rendered, and that deliberately omitted any mention of the tax shelter.

        k.      On or about March 14, 2000, co-conspirator Adrian Dicker sent an e-mail to co-conspirator Robert Greisman that contained Dicker's comments on a J&G draft template SOS opinion letter.

        l.      On or about March 22, 2000, J&G sent an invoice for $681,000 to Client N.D. as J&G's fee for the SOS tax shelter.  J&G's fee equaled three per cent (3%) of the $22.7 million tax loss sought by Client N.D.

        m.      On or about April 12, 2000, under a cover letter she signed, co-conspirator Donna Guerin sent a false and fraudulent J&G opinion letter to Client N.D. in support of his SOS tax shelter.  Guerin also sent copies of the cover letter and opinion letter to co-conspirator Michael Kerekes of BDO.

        n.      On or about June 5, 2000, BDO signed a compensation agreement with co-conspirators Denis Field, Charles Bee, and Adrian Dicker, retroactive to July 1, 1999, that entitled them to 30% of the net profits of the TSG, which they were to share equally.

        o.      On or about August 15, 2000, BDO tax shelter Client N.D. signed and filed with the IRS a false and fraudulent 1999 U.S. Individual Income Tax Return, Form

1040, on which he claimed fraudulent losses derived from a J&G SOS tax shelter and which substantially reduced the income taxes he would otherwise have owed.

p.      In the Fall of 2000, co-conspirators Denis Field and Charles Bee caused BDO's Outside Law Firm A to delete damaging information from its report for BDO regarding the practices of the Tax Solutions Group, and made false statements about the conclusions of BDO's Outside Law Firm A to members of the TSG and BDO's Board of Directors, in order to continue and encourage the lucrative sales of BDO's tax shelters.

q.      On or about February 24, 2002, co-conspirator Robert Greisman met with tax shelter Client H.F. and his advisor, and a BDO TSG member, regarding Client H.F.'s response to IRS information requests relating to Client H.F.'s tax shelter.

r.      On or about August 9, 2002, co-conspirator Michael Kerekes made false and misleading statements to the IRS during a deposition relating to the audit of tax shelter Client B.A.

s.      On or about December 10, 2002, co-conspirator Michael Kerekes made false and misleading statements to the IRS during a second deposition relating to the audit of Client B.A.

t.      On or about April 7, 2003, co-conspirator Robert Greisman faxed a letter to J&G identifying tax shelter clients who needed "follow up" tax opinions in 2003 relating to tax shelters executed in earlier tax years that generated losses in 2002.

u.      On or about October 18, 2003, BDO tax shelter Client W.H. filed with the IRS a false and fraudulent 2002 U.S. Individual Income Tax Return, Form 1040, on which he

claimed fraudulent losses derived from a BDO SOS tax shelter and which substantially reduced the

taxes he would otherwise have owed.

(Title 18, United States Code, Section 371.)

*Preet Bharara*

PREET BHARARA
United States Attorney